FILED
2005 Sep-02 AM 11:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **JERRY O. MINOR,** ) | |
| ) | |
| **PLAINTIFF,** ) | |
| ) | |
| **VS.** ) | **2:04-cv-0826-JHH** |
| ) | |
| **L.B. SMITH, INC.,** ) | |
| ) | |
| **DEFENDANT.** ) | |

## MEMORANDUM OF DECISION

The court has before it the June 30, 2005 motion (doc. # 19) of defendant L.B. Smith, Inc. for summary judgment. Pursuant to the court's July 5, 2005 order (doc. #22), the motion was deemed submitted, without oral argument, on August 9, 2005.

### I. Procedural History

Plaintiff Jerry O. Minor commenced this action on April 23, 2004 by filing a complaint in this court alleging that his former employer, defendant L.B. Smith, Inc. ("L.B. Smith") wrongfully terminated him[1] in violation of the Age

---

[1] Plaintiff's complaint alleges that he was *terminated* by L.B. Smith in violation of the ADEA. Defendant, however, seems to be defending a *failure to hire* claim. (Def.'s Mem. Supp. Summ. J. 11 n.3, 13, 17.) Since a failure to hire claim could not be properly brought against L.B. Smith based on these facts, the court will construe defendant's memorandum in support of summary judgment as though it discusses a termination claim. The basic arguments set forth in

Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621, et seq. (See Compl.) Defendant's June 30, 2005 motion for summary judgment asserts that there is no genuine issue of material fact and that defendant is entitled to judgment as a matter of law. (See generally Def.'s Mot. Summ. J.)

On June 30, 2005, defendant filed evidence[2] and a memorandum of law (doc. # 20) in support of its motion. Plaintiff filed a brief (doc. # 26) in opposition to the motion on July 29, 2005 and evidence[3] (doc. # 27) in opposition to the motion on July 30, 2005. Defendant filed a reply brief (doc. # 32) to plaintiff's

---

defendant's memorandum (plaintiff cannot establish a prima facie case, cannot rebut defendant's legitimate, non-discriminatory reason, and cannot demonstrate a violation of ADEA) apply to a termination claim as well as a failure to hire claim.

[2] Defendants submitted the following evidence: the declaration of Bob Winnette; the deposition of Jerry O. Minor; plaintiff's application for employment, including a statement signed by plaintiff recognizing that any employment with L.B. Smith, Inc. would be "at will"; L.B. Smith, Inc.'s harassment policy, signed by plaintiff; the employment agreement between plaintiff and defendant, signed by plaintiff; the Charge of Discrimination plaintiff filed with the EEOC; a memo from Jim Stem to Bob Winnette and Arthur Soulis regarding sales territories; plaintiff's Dismissal and Notice of Rights from the EEOC; plaintiff's complaint in this case; plaintiff's attorney's FOIA request to the EEOC and the EEOC records obtained pursuant to that request; a list of companies with whom plaintiff sought employment after his termination from defendant; plaintiff's tax returns and other tax documents from 1998-2003; plaintiff's resume; the declaration of Arthur Soulis; an offer of judgment from defendant to plaintiff; call logs describing calls plaintiff made in connection with his employment; the affidavit of Bob Winnette; an Employee Information Change Form filled out by defendant's representatives and describing plaintiff's severance package; defendant's answers, responses, and objections to plaintiff's request for admissions, interrogatories, and request for production of documents; and the deposition of Bob Winnette.

[3] Plaintiff submitted the following as evidence: the declaration of Jerry O. Minor. In his brief, plaintiff relies extensively on evidence submitted by defendant.

opposition on August 8, 2005.  The court has considered all of the briefs and the evidence.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that the moving party believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp., 477 U.S. at 323.  Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions of file, designate specific facts showing that there is a genuine issue for trial.  Id. at 324.

The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Chapman, 229 F.3d at 1023.  All reasonable doubts about the facts and all justifiable

inferences are resolved in favor of the non-movant. Chapman, 229 F.3d at 1023; Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; Chapman, 229 F.3d at 1023. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249. The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. Fitzpatrick, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus

demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.  The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  <u>Fitzpatrick</u>, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  <u>Lewis v. Casey</u>, 518 U.S. 343, 358 (1996) (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992)).

### III. Relevant Undisputed Facts[4]

In 1994, at the age of forty-six, Jerry O. Minor began working for L.B. Smith, Inc. as a sales representative selling heavy equipment. (Minor Dep. at 25-26, 40-41.) As an L.B. Smith sales representative, Minor sold a number of different types of construction products made by several different manufacturers to customers in the sales territory to which he was assigned. (Id. at 42-46.)

In 1999, Minor recovered from open heart surgery and arterial surgery. (EEOC Charge of Discrimination at 2.) After that point, Minor believes L.B. Smith perceived him as being "too old" even though his sales continued to be high. (Id.) Further, Minor claims that L.B. Smith was seeking to replace him with an "aggressive young salesman" based on a February 22, 2001 memo from Jim Stem, the L.B. Smith vice-president supervising the Birmingham office, to the managers at the Birmingham office regarding the division of sales territories in Alabama. (Id.; Minor Dep. at 84-85, 87; see Mem. from Jim Stem to Arthur Soulis and Bob Winnette dated Feb. 22, 2001.) The memo does not explicitly mention terminating or replacing anyone; instead it seems to be about a disagreement between Stem and the Birmingham office regarding the structuring of sales

---

[4] If the facts are in dispute, they are stated in the manner most favorable to the non-moving party. See Fitzpatrick, 2 F.3d at 1115.

territories.  (Mem. from Jim Stem to Arthur Soulis and Bob Winnette dated Feb. 22, 2001.)

In February 2001, L.B. Smith obtained the exclusive rights to distribute Volvo heavy equipment while continuing to sell its existing product lines.  (Winnette Dep. at 19-20; Minor Dep. at 46-47.)  At the same time L.B. Smith acquired the rights to distribute Volvo equipment, it hired Bob Winnette, who had worked for Volvo's previous distributor, as sales manager.  (Winnette Dep. at 19-21.)  Winnette was subsequently promoted to branch manager in October 2002.  (Id. at 20-21.)  From 2001 until Minor's termination on May 2, 2003, Winnette was Minor's direct supervisor at L.B. Smith.  (Minor Dep. at 42.)

After L.B. Smith acquired the rights to distribute Volvo equipment, Winnette and the rest of the L.B. Smith management encouraged the sales representatives, including Minor, to develop their territories for the sale of Volvo equipment.  (Winnette Dep. at 21-22.)  Based on his analysis of the market share numbers, Winnette believed that Minor's territory had the most potential for the sale of Volvo heavy equipment to new customers.  (Winnette Dep. at 27.)  Winnette believed, however, that Minor was content with the commissions he was making from selling cranes and was not willing to expend enough energy on developing his territory for Volvo equipment.  (See id. at 23.)  In February 2003,

for example, Minor failed to contact a potential customer, Shelby County, that was in the market for a substantial amount of heavy equipment. (Id. at 24-26.) Shortly thereafter, in late February or early March of 2003, Winnette spoke with Minor in his office about Minor's failure to develop his territory for Volvo heavy equipment and urged him to focus on selling Volvo equipment and not just cranes.[5] (See Minor Dep. at 63-64.) Minor later told Winnette that their conversation had been a "wake-up call" and that he realized he had not been doing all that he could to develop his territory for Volvo equipment.

Also in early 2003, L.B. Smith began considering selling its Birmingham office to SABA Holding Company, Inc. ("SABA"). If SABA purchased L.B. Smith, the new company would exclusively sell Volvo equipment and would not sell cranes or other types of machines not manufactured by Volvo. In anticipation of this deal, Jim Stem informed Winnette that he would be given the task of recommending which L.B. Smith employees SABA should hire and that he should recommend L.B. Smith salespeople whom he deemed effective but not those he deemed ineffective. (See Winnette Dep. at 27-28.) Although Winnette recommended the other three sales representatives who he oversaw in the

---

[5] Apparently, it was common knowledge at the company that Minor was adept at selling cranes.

Birmingham office, Larry Carmichael, William Cantrell, and Tony Stanfield, Winnette did not recommend Minor because he did not believe Minor had been effective at selling Volvo equipment. (Winnette Dep. at 27-30.) Two of the sales representatives Winnette recommended, Carmichael and Cantrell, are older than Minor.

The sale of the Birmingham L.B. Smith branch to SABA was originally scheduled to close on Friday, May 2, 2003, but unknown to Winnette at the time of his May 2, 2003 meeting with Minor, the sale closing had been moved forward to May 7, 2003. As of the closing date for the sale, which Winnette believed was May 2, 2003, Winnette was aware that none of the previous L.B. Smith employees at the Birmingham branch would still be employed by L.B. Smith after the closing, and most, if not all, of them except Minor were to be hired by SABA. (Winnette Aff. ¶ 4-5.) Mistakenly believing May 2, 2003 was Minor's last day of employment with defendant, Winnette met with Minor and told him that L.B. Smith "wasn't going to be needing [him] anymore." (Minor Dep. at 62-64.) Winnette told Minor that he was being terminated because the company was "going in a different direction." (Winnette Dep. at 29; Minor Dep. at 64.) Winnette did not explain to Minor that he had not recommended him to SABA and that he was being terminated because of his failure to develop his territory for

Volvo equipment and his lack of enthusiasm for and interest in selling the equipment. (Winnette Dep. at 30-32.) During their meeting, Winnette recommended that Minor try to get a job with a company that sells cranes, Atlantic Southern. (Minor Dep. at 65-66; Winnette Dep. at 28.) Even though Winnette believed he was terminating Minor's employment on the date SABA assumed control of L.B. Smith's Birmingham branch, as noted earlier, the deal between SABA and L.B. Smith did not actually close until five days later, on May 7, 2003.

When Brad Searcy, an L.B. Smith sales representative who was working in the Montgomery, Alabama, office, heard that Minor had been terminated, he called Winnette to see if he could move to the Birmingham office, where he had previously worked. (Winnette Dep. at 30.) Winnette allowed the move, which took place in June 2003, at which time Searcy was hired by SABA. (Id.) Although Searcy's exact age is not in the evidence submitted by either party, he is significantly younger than Minor, and Minor believes that he is around 25 or 26 years old. (Minor Dep. at 61.) Minor testified that Searcy replaced him as a salesperson at L.B. Smith. (Id.)

### IV. Applicable Substantive Law and Analysis

Plaintiff's complaint alleges he was terminated because of his age in violation of the ADEA. Defendant's motion for summary judgment, as amplified

in its memorandum in support thereof, asserts that (1) plaintiff cannot establish a prima face case for a violation of the ADEA, (2) even if plaintiff could establish a prima facie case, he cannot rebut the legitimate, non-discriminatory reason for his termination, and (3) even if plaintiff could demonstrate a violation of the ADEA, his claim should be dismissed because he cannot recover any of the relief available under the ADEA.  (See generally Def.'s Mem. Supp. Summ. J.)

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  In cases brought under the ADEA, the plaintiff has the burden of proving by a preponderance of the evidence that age was a determinative factor, although it need not be the only factor, in the employer's decision to terminate his employment.  See Anderson v. Savage Lab., Inc., 675 F.2d 1221, 1223-24 (11th Cir. 1982).

To establish a prima facie case under the ADEA, a plaintiff must show that he (1) was a member of the protected class of persons between the ages of forty and seventy, (2) was subject to an adverse employment action, (3) was replaced with a person substantially younger than the plaintiff, and (4) was qualified to do the job.  O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 309-13 (1996);

Jameson v. Arrow Co., 75 F.3d 1528, 1531 (11th Cir. 1996).

It is undisputed that plaintiff can establish the first and fourth elements of his prima facie case. Minor, who was discharged at the age of fifty-four, falls within the class protected by the ADEA. (Minor Dep. at 8; Winnette Aff. ¶ 4.) Defendant also does not dispute that plaintiff was qualified. (Pl.'s Br. Opp'n Mot. Summ. J. 8.) "'[I]n cases where a plaintiff has held a position for a significant period of time, qualification for that position sufficient to satisfy the test of a prima facie case can be inferred.'" Damon v. Fleming Supermarkets of Florida, 196 F.3d 1354, 1360 (11th Cir. 1999) (quoting Young v. Gen. Foods Corp., 840 F.2d 825, 830 n.3 (11th Cir. 1988)). In the instant case, plaintiff's nine-year tenure at his job is sufficient for the court to infer, without deciding, that he is qualified for purposes of his prima facie case. In addition, although defendant claims that plaintiff was not sufficiently developing his sales territory for Volvo equipment, this allegation of poor performance is not properly considered in deciding whether plaintiff has established a prima facie case. Such allegations of poor performance will only be considered "*after* a prima facie case has been established, when a court evaluates the pretextual nature of an employer's proffered non-discriminatory reasons for termination." Damon, 196 F.3d at 1360 (emphasis in original).

Defendant disputes the existence of the second element of plaintiff's prima facie case: that Minor was subject to an adverse employment action. L.B. Smith contends that SABA, the company that acquired it on May 7, 2003, and not L.B. Smith, is responsible for terminating plaintiff's employment because Bob Winnette believed he was acting on behalf of SABA, not L.B. Smith, when he terminated Minor. This argument fails. At the time Winnette terminated Minor on May 2, 2003, both men were employed by L.B. Smith, Inc., and Winnette, as branch manager of L.B. Smith, was acting as L.B. Smith's agent when he terminated one of the L.B. Smith employees he supervised. (See Winnette Decl. ¶ 3.) Winnette could not have been acting on behalf of SABA because the person being terminated was not employed by SABA. Further, while Winnette was advising SABA regarding its employment decisions, there is no evidence that Winnette was employed by SABA when Minor's termination occurred. Winnette did not work for SABA until May 7, 2003, when SABA actually acquired the Birmingham branch of L.B. Smith, five days *after* Minor's employment was terminated. (Winnette Aff. ¶¶ 4-5.) Thus, while Winnette's decision to fire Minor might have been predominantly influenced by the deal between SABA and L.B. Smith, Winnette and Minor were both still employed by L.B. Smith on the date Minor's employment was terminated, which means that defendant L.B. Smith was

responsible for the adverse employment action against Minor and that Minor has established that element of his prima facie case.

Defendant also disputes the existence of the third element of Minor's prima facie case: that Minor was replaced by a substantially younger person. Defendant argues that plaintiff was not "replaced" by Searcy. The court agrees. When Searcy was transferred from the defendant's Montgomery office to Birmingham in June 2003, even though it was to assume a position like the one Minor had previously held, the transfer constituted a hiring by SABA, the new owner of the Birmingham branch, and thus does not constitute a replacement by defendant for plaintiff. L.B. Smith simply did not replace Minor with a younger employee or, for that matter, with any employee at all. By the time Searcy moved to Birmingham and took the job at SABA alongside Minor's former coworkers, who were then employed by SABA, the Birmingham office of L.B. Smith no longer existed. Thus, defendant could not and did not hire Searcy in June 2003 to work in its former Birmingham office, then owned and operated by SABA.

Binding precedent mandates that when a plaintiff's position is eliminated and the subsequent employee is performing a substantially similar job function, the plaintiff has proven that he has been replaced for purposes of establishing his prima facie case, see, e.g., Eskra v. Provident Life and Accident Ins. Co., 125 F.3d

14

1406, 1410, 1412 (11th Cir. 1997), but this principle necessarily is premised upon the *same employer* making the decision to eliminate a position and the decision to hire a person for a substantially similar job.  Such was not the case here.  In this case, defendant made the first decision, and SABA made the second.  Defendant L.B. Smith cannot be held liable to plaintiff Minor under ADEA because *SABA* chose to hire the three salesmen who previously worked with Minor and an additional, younger salesman to take over what was previously Minor's territory.  Those actions were taken by SABA, not by L.B. Smith, the defendant in this case.  It is simply an undisputed fact that defendant did not replace plaintiff as its employee, and it certainly did not replace him with Searcy.  Thus, Minor has not shown and cannot show that defendant replaced him with a substantially younger person, and he has failed to establish a prima facie case for his wrongful termination claim.

In summary, the court finds that no material issues of fact remain and that defendant L.B. Smith, Inc. is entitled to judgment as a matter of law as to all claims asserted by plaintiff.  A separate order will be entered.

**DONE** this the ___1st___ day of September, 2005.

_____
SENIOR UNITED STATES DISTRICT JUDGE

Case 2:04-cv-00826-JHH   Document 35   Filed 09/02/05   Page 16 of 16